UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Civil No. 05-916 (JRT/FLN) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION** |
| Cedric Dillard, | |
| Respondent. | |

_____

Perry F. Sekus, Assistant United States Attorney, for Plaintiff.
Katherine Menendez, Assistant Federal Public Defender, for Defendant.

_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on June 30, 2005, for a hearing on the Government's Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 [#1]. Specifically, the Government seeks to involuntarily commit Mr. Cedric Dillard to the mental health unit at the Federal Medical Center (FMC) in Rochester, Minnesota. The Petition alleges that Mr. Dillard is presently suffering from a mental disease or defect for the treatment of which he is in need of custody and care in a suitable psychiatric facility. Mr. Dillard is currently serving a 150-month sentence imposed by the United States District Court, Western District of Louisiana, for Conspiracy to Possess with Intent to Distribute 50 Grams or more of Cocaine Base and Distribution of 50 Grams or More of Cocaine Base. His anticipated release date is February 19, 2013. As set forth below, we recommend that the Petition be granted.

**I. FINDINGS OF FACT**

On June 30, 2005, the Court held a hearing on the Government's Petition. Mr. Dillard was

not present for the hearing. Counsel for the government and defense counsel both represented to the Court that staff at FMC-Rochester had tried without success to persuade respondent to attend. Mr. Dillard's counsel represented to the Court on the record before the hearing, that she had personally met with Mr. Dillard and explained the purpose of the hearing to him, informed him that he had a right to be present at the hearing, and strongly suggested he attend the hearing. Mr. Dillard declined to be present at the hearing. Being satisfied that every effort had been made to secure Mr. Dillard's participation, the Court convened the hearing and decided not to compel his attendance by force.            Dr. Andrew Simcox testified at the hearing regarding Mr. Dillard's impairments and treatment at FMC Rochester. Dr. Simcox has been the Chief of Psychology at FMC Rochester since 2001. He testified that he worked with Dr. Daniel Shine, a staff psychiatrist, in reviewing Mr. Dillard's records and treatment possibilities on several occasions over the last few years. Dr. Simcox testified that he attempted to interview Mr. Dillard on numerous occasions, but received very limited communication from him. Dr. Simcox testified that he also reviewed Mr. Dillard's records in making his assessment, and spoke with other FMC Rochester staff. Dr Simcox stated that Mr. Dillard was most recently diagnosed with Schizophrenia - Undifferentiated type. Related to this psychotic disorder, Mr. Dillard suffers from delusions, a confused state, possible catatonia, and possible auditory hallucinations.

   Mr. Dillard was first incarcerated by the BOP in 2002 at the Federal Correctional Institution (FCI) in Texarkana, Texas. The first report of psychiatric symptoms was in August 2003. On several occasions Mr. Dillard would go to the Receiving and Discharge section of the institution and state that he had received a decade reprieve on his sentence from "Mr. Big" and that "The Official" instructed that he was to be released immediately. (Government's Ex. B, Mental Health Evaluation,

p. 2).  Psychology staff noted that Mr. Dillard was not accepting his long sentence and was becoming increasingly angry and accusatory toward staff and other inmates.  At times his thoughts were not logical and reflected that he felt he was being persecuted and mistreated by staff and other inmates.  Mr. Dillard was placed in the Special Housing Unit (SHU) after a fight with another inmate on August 27, 2003.  He denied having any psychological problems and continued to insist that he should be released.  Staff stated that at times, he seemed to be responding to internal stimuli and his speech was incomprehensible.  At some point, Mr. Dillard's cooperation deteriorated further.  He stayed in bed, refused meals, ignored attempts to communicate with him, and continued to refuse treatment.  (Id.).  As a result, Mr. Dillard was transferred to FMC Rochester to undergo evaluation on October 14, 2003.

Initially, Mr. Dillard was housed on the open unit of the Diagnosis and Observation service and cooperated with evaluations.  After a week, he began to show psychotic thought processes. He reported beliefs that he was being watched and persecuted by "payroll inmates," that BOP staff ran a "laser stimulator and simulator" every night, and that staff were able to enter his "nasal cavity." Mr. Dillard became more agitated and was placed in SHU, until his behavior normalized and his paranoid thoughts decreased.   When Mr. Dillard began working in the food service dishwashing room he reported that laser beams were coming from the dishwashing machine and he needed to be reassigned.  Mr. Dillard received a diagnosis of Schizophrenia, Paranoid Type, Single Episode and was offered voluntary hospitalization and treatment.  He refused treatment but it was determined that there was "lack of sufficient grounds" to petition a commitment for treatment as Mr. Dillard was then able to function on the open unit, independently complete activities of daily living, and no longer displayed aggressive or assaultive behavior.

3

Mr. Dillard was transferred to the Federal Correctional Complex ("FCC") in Beaumont, Texas, in June 2004. Mr. Dillard did not present any psychotic behavior or thought processes until December 2004, when he went to the Lieutenant's office claiming he had an Order for his release which had been stolen from him as part of a conspiracy to keep him in prison. Mr. Dillard later arrived at the Receiving and Discharge area demanding to be released. At this time Mr. Dillard also reported that lasers from the Captain's computer were used to "cook his brain." He stated that x-rays of his brain from FMC Rochester revealed scarring but a third x-ray showed that they had since healed. In late December 2004, Mr. Dillard had a confrontation with an officer when his demands for release were denied. He was placed in SHU and considered increasingly paranoid, delusional, aggressive, as well as a security concern.

On March 3, 2005, Mr. Dillard was transferred back to FMC Rochester. Upon his return to FMC Rochester, Mr. Dillard continued to express delusional beliefs that he was supposed to have been released and demanding his papers so he could leave. The following day, Mr. Dillard became more oppositional and aggressive toward staff. At one point he became verbally aggressive and stripped in front of staff when asked to change his clothing. Later the same day, he became threatening and aggressive toward a case manager after entering her office and demanding a gate pass and his release. He refused to leave and became louder and more agitated, expressing anger that staff was keeping him from being released. The case manager felt threatened and called for assistance. Upon their arrival, Mr. Dillard ran from the office down a hallway, where he grabbed a vacuum cleaner and began swinging it above his head, stating he would not be locked up. He was restrained, determined to be psychotic and a threat to others, and placed in locked housing in SHU. Clinical staff found Mr. Dillard to be not competent and not responsible for his behavior as a result

4

of his mental illness.

Mr. Dillard has remained in locked housing in the SHU for monitoring. He continues to express delusional thoughts about being released but has not shown any aggressive behavior in locked housing. He denies he has a mental illness, refuses treatment, and is unresponsive to attempts to educate him about mental illness. During an Initial Psychiatric Evaluation and Assessment Plan he was described to have a flat affect, incoherent speech and thought content, and poor insight and judgment. He was diagnosed with Schizophrenia, Undifferentiated Type, due to his delusional thoughts of a persecutory nature, his associated anger and aggressive behavior, and disorganized and uncomprehensible speech. Dr. Simcox testified that several factors suggested that with treatment, the prognosis for Mr. Dillard was good. He noted that the late onset, the absence of structural brain abnormalities, the good inter-episode functioning, together with early and consistent treatment with anti-psychotic medications were associated with a better prognosis. However, without psychiatric treatment, his mental status is unlikely to change and may continue to deteriorate. Mr. Dillard's delusional thoughts and lack of organization preclude him from being able to function outside of locked housing and contribute to his potential for aggression and violent behavior towards others.

Dr. Simcox testified that Mr. Dillard's diagnosis changed from that of Schizophrenia, Paranoid Type, Single Episode, to Schizophrenia of an Undifferentiated Type, due to Mr. Dillard's multiple episodes and variety of symptoms. He testified that in his opinion within a reasonable degree of medical certainty, Mr. Dillard suffered from a severe mental illness, namely Schizophrenia, Undifferentiated Type.

Dr. Simcox also stated that Mr. Dillard is in need of custody for care and treatment as he

presents a risk to other inmates and staff, and he is unable to function in general population, where he is prone to engage in arguments, fights, and try to leave the facility. Dr. Simcox testified that Mr. Dillard's prognosis was positive if he received treatment and that suitable treatment was available at FMC Rochester.

## II. LEGAL ANALYSIS

Pursuant to 18 U.S.C. § 4245, a federal prisoner may not be transferred to a mental hospital or treatment facility, without the prisoner's consent or a court order. See United States v. Watson, 893 F.2d 970, 975 (8th Cir. 1990) vacated in part on reh'g on other grounds by United States v. Holmes, 900 F.2d 1322 (8th Cir. 1990). If the prisoner objects to being transferred, then the court must hold a hearing to determine if there is "reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a); United States v. Jones, 811 F.2d 444, 447 (8th Cir.1987). If, after the hearing, the court finds by a preponderance of the evidence that the person is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney General. 18 U.S.C. § 4245(d). Whether a person is in need of care or treatment is a question of fact, left to the judicial decision maker. Watson, 893 F. 2d at 972. If the court determines that the inmate is suffering from a mental disease and is in need of treatment, the Attorney General must then hospitalize the prisoner "for treatment in a suitable facility until he is no longer in need of such custody for care or treatment or until the expiration of the sentence of imprisonment, whichever occurs earlier." 18 U.S.C. § 4245(d).

This Court is, therefore, required to determine three issues: is Mr. Dillard suffering from a

mental disease or defect; is he in need of custody for care or treatment of that disease or defect; and is the proposed facility a suitable facility. For the reasons set forth below, this Court concludes that the answer to all of these questions is yes.

### A.     Mental Disease or Defect

Mr. Dillard is suffering from a mental disease or defect. Dr. Simcox testified that he has diagnosed Mr. Dillard with Schizophrenia, Undifferentiated Type, and his colleagues at FMC Rochester concur with that diagnosis. Dr. Simcox made this assessment based on a review of Mr. Dillard's records and central file, attempted personal interactions with Mr. Dillard, and reports from other FMC Rochester staff. Dr. Simcox testified about numerous symptoms indicative of Mr. Dillard's mental disease: his delusions, inability to reason, observed responses to internal stimuli and auditory hallucinations, confused state, including disorganized thoughts and uncomprehensible speech, possible catatonia, and a lack of insight into his illness. Based on Dr. Simcox's expert opinion and the records before the Court, we conclude that the government has satisfied its burden of showing by a preponderance of the evidence that Mr. Dillard is suffering from a mental disease or defect, specifically, Schizophrenia.

### B.     In Need of Custody for Care or Treatment

This Court finds that Mr. Dillard is in need of custody for care or treatment. The term "need" is not defined by 18 U.S.C. § 4245. Whether a person is in need of care or treatment is a question of fact, left to the judicial decision maker. In order to be needed, treatment must be more than merely beneficial to the prisoner. See United States v. Eckerson, 299 F.3d 913 (8th Cir. 2002); United States v. Horne, 955 F.Supp. 1141, 1147 (D. Minn. 1997). The Eighth Circuit in Watson, 893 F.2d 982, held that it is more favorable to restore an inmate's ability to function in the general

7

population through forced medication, than keep an inmate in seclusion, even if he functioned adequately there.  In other words, the court in Watson found that "need" does exist if treatment would enable the prisoner to function in the general population.  In Horne, evidence that the respondent was dangerous to prison staff and other inmates was noted when deciding whether there was need of custody and treatment.  Horne, 955 F. Supp. at 1147.

Here the government has established "need" by proving that Mr. Dillard cannot function in the general prison population and by providing evidence that he is a threat to prison staff and other inmates.  While Mr. Dillard has not shown aggressive behavior while in SHU, on his multiple reintegrations with the general population, his aggressive and assaultive behavior has returned.  Each time he became more agitated as a result of his delusions of conspiracy and persecution.  Dr. Simcox specifically testified that Mr. Dillard is in need of custody as he presents a risk to other inmates and staff, and is unable to function in general population, where he is prone to engage in arguments, fights, and try to leave the facility.  Mr. Dillard is considered a risk to other people, he has been oppositional and aggressive with staff, and on at least one occasion he has been found mentally incompetent to assume responsibility for actions which otherwise would have been disciplinary violations.  Under these circumstances, we conclude that Mr. Dillard is in need of custody for care and treatment.

We also conclude that FMC Rochester is a suitable facility for Mr. Dillard's treatment.  Dr. Simcox testified that FMC Rochester would be a suitable facility and Mr. Dillard has not presented any evidence to the contrary.

### III. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that the Government's Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 [#1] be **GRANTED**. Mr. Cedric Dillard should be committed to the custody of the Attorney General and hospitalized at FMC Rochester.

Dated: July 5, 2005                     s/ Franklin L. Noel
                                        FRANKLIN L. NOEL
                                        United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **July 22, 2005**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **July 22, 2005,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.